Good morning, ladies and gentlemen. Our first case for argument this morning is United States v. Fenner. Mr. Hawkins. Mr. Hawks, please proceed. Good morning, and may it please the court. Walter Hawes on behalf of Brian Fenner. I'll be presenting the common issues in Mr. Fenner's opening brief and the brutal issue unique to Mr. Fenner. Defendants will submit restitution on the briefs unless this court has questions. The government repeatedly violated the rules of evidence below. As a result, three evidentiary errors rendered Mr. Fenner's trial fundamentally unfair. First, the government's summary witness, Agent Graham, violated the limits on summary testimony by repeatedly drawing speculative conclusions and opining on defendants' intent. Second, the government introduced unnoticed expert testimony through Agent Konecki, an FBI forensic accountant. And finally, the government introduced the powerfully incriminating statements of Mr. Fenner's non-testifying co-defendant, Mr. Berkley, in violation of the Sixth Amendment. Each error gravely prejudiced Mr. Fenner. Each went to the heart of the government's case, each was intentionally elicited by the government, and each was repeated throughout trial. Independently and certainly cumulatively, those errors require a new trial. Turning to the first piece of inadmissible evidence, Agent Graham's testimony. That went far beyond the summary testimony permitted by Rule 1006, which authorizes summary testimony to prove the content of voluminous admitted documents. Agent Graham did much more. She repeatedly testified regarding why the defendants took certain action or failed to take certain action. She testified to the effect that certain conduct might have on others, and she drew inferences regarding defendants' thinking and intent from the documents. None of that testimony was permissible. It went well beyond reporting the content of the documents that she was purportedly summarizing. Each conclusion constituted Graham's own speculative inference. Now, the government offers two potential justifications. First, it argues that summary witnesses may draw any reasonable inference as long as it's rationally related to the documents. But that is inconsistent with Rule 1006 and this court's precedent and other courts' decisions. Nothing in the cases the government cites supports such a broad rule which would permit government witnesses to routinely, under the guise of summary testimony, advance the government's case theory at trial. The government's position lacks any limiting feature. And the government's second justification fares no better. They argue that Agent Graham's testimony can come in as lay opinion testimony, but Graham's testimony was not rationally based on her perception under 701A, nor was it helpful to the jury under 701B insofar as it constituted a pure legal conclusion as to what defendants intended. With Graham, I'm more interested in your response to their contention that it was harmless error. If there was error, it was harmless. It was not harmless error in several aspects of Graham's testimony to make that clear, Your Honor. First, this was not a single instance of impermissible testimony where the summary witness went over the line and then immediately came back. This was repeated speculative testimony that occurred again and again throughout trial, and it was intentionally elicited by the government. Looking at the questions they asked, they asked Graham, what does that indicate about how Mr. Berkley and Mr. Fenner viewed their relationship? They asked about why Mr. Berkley would have not sent any soliciting emails. Those were not questions that Graham could answer based on her personal knowledge or based on the documents in front of her, and it came out again and again. And the government also emphasized that testimony at trial. In closing, which was only 45 minutes, it came back to Graham's speculative conclusion regarding concealment at least nine times. Combined, those aspects of her testimony show that it was not harmless and that this court cannot have the confidence beyond a reasonable doubt that the jury would have reached the same conclusion absent the error. Nor was it cumulative of the other evidence that the government points to. The government points to certain bank records and emails. On their face, those documents do not show concealment. They only show that Berkley and AMI filled out checks and that they were sent with Fenner listed as the remitter. Nor do the emails about Whiteout prove concealment. Under this court's decision in Chaparro, to be harmlessly cumulative, the other untainted evidence must be so overwhelming that we reach that confidence that the jury would have reached the same result beyond a reasonable doubt. And here, the other evidence that the government points to simply cannot clear that bar. What confirms that is that the issue was hotly contested at trial and there was actually non-concealment-based explanations given by Mr. Fenner. The second piece of inadmissible evidence, Agent Konecki's unnoticed expert testimony, amplifies the prejudice against the defendants. In her own words, Konecki said that she utilizes her specialized knowledge, as a quote from her testimony at sentencing of Mr. Berkley, and her investigative skills to collect and analyze and evaluate financial matters. That's what she does as an FBI forensic accountant. That is what she did in this case, and two aspects of her testimony demonstrate that. First, the character of Konecki's conclusions. She concluded that the accounting showed that there were no genuine sales. That is a conclusion you can only reach if you are analyzing the thousands of pages of financial records and assessing whether there is any way in which the accounting could have shown that sales occurred. Drawing that definitive negative conclusion demonstrates the expert nature of her testimony. And second, the complexity of her analysis. She looked at more than 10,000 pages of financial records that ran across 11 different accounts over four years. That is not just simple math, as the government would put it. And this case is a far cry from what occurred in Davis. And Konecki's testimony was not harmless either. For many of the same reasons that Graham's was prejudicial, so was Konecki's. It was repeated testimony that came out throughout trial. It was intentionally elicited by the government, and the government emphasized it at closing, again, no fewer than 10 times, pointing to Konecki's conclusion, which went to the big lie, the central misrepresentation at the heart of the government's case. Konecki's prejudice might have been cured had the government noticed her, as they were required to under the rules. But they did not do that here, and that resulted in even additional prejudice, because defendants could not obtain an expert or engage in full cross-examination of Konecki. With respect to Mr. Bruton, sorry, with respect to Mr. Fenner, the Bruton violation further amplifies the prejudice at trial. The government, as the capstone of its case, specifically elicited through two independent law enforcement witnesses the powerfully incriminating statements from Mr. Berkley that confirmed the big lie, the central misrepresentation at the heart of the government's fraud case, and concealment, which was a necessary element of the government's money laundering case. It brought those statements together and intentionally laid them before the jury, and those statements explicitly referenced Mr. Fenner no less than 10 times. Was there an objection on Sixth Amendment grounds? There was no objection to the Bruton issue, Your Honor. That's here on plain error. It constitutes plain error, however, because of the severity of the violation. This is unlike the Bruton errors that this court has reviewed in Jett, in Javel, in Monsori. Most Bruton errors come to this court after there were redactions put in place because the government or the district court was careful to avoid incriminating inferences at trial. None of that happened here. This case is similar to Jones against Bassinger, which is cited on page 10 of Mr. Berkley's opening brief, where the government unabashedly used explicitly incriminating statements to show the jury the key components of its case, to explicitly name Fenner's involvement, and to then emphasize that at closing, where the government repeatedly referenced the statements that came in. That prejudice, combined with the other two pieces of evidence, demonstrates the need for a new trial here. Unless the panel has any questions, I'll reserve the remainder of my time for rebuttal. Certainly, counsel. Mr. Turner. Good morning. Philip Turner on behalf of Mr. Berkley. Obviously, we adopt the arguments of Mr. Fenner, both in the briefs and also here. But the first thing, I'd want to just amplify a couple of things. With regard to the Graham testimony, not only was it beyond the scope of a summary witness, but it was a Sixth Amendment violation. The transcript shows that the witness repeatedly said, based on the investigation, based on the investigation, we conclude this, based on the investigation. Well, obviously, as admitted on cross-examination, she said that that was consisted of her reading notes of other people, other agents who had been involved in the case, all kinds of hearsay things. And as the record reflects, I continuously objected to this. I argued that it was a Sixth Amendment violation, not only hearsay. I moved for a mistrial. And the district court even said at one point, as the result of one of my objections on Volume 3, page 377, the court, after my objection, its summary testimony, based upon the investigation, is what it is, based on documents. Not based on documents and evidence, but based on the investigation. And as counsel cited, the case of Jones v. Bessinger, which is 635 Fed 1030, by this court, indicates that that is a clear Sixth Amendment violation. And clearly here, that is what has happened. Because as the court can see from the review of the transcript, that all the questions were premised on, based on your investigation, based on your investigation. Well, obviously, this agent had no personal knowledge of those things, wasn't even working for the FBI at the time, and as she admitted, it's based on her reviewing notes of other people and things like that. And some of the examples counsel has cited, but there were other things. For example, she said, based on the investigation, the victims of this crime were the lenders. Other things she said, and this is on Volume 3, page 414, based on your investigation, did some of the auto lenders attempt to get their vehicles back? Yes. Well, I mean, it's obvious that that's based on some investigation. It's impossible to cross-examine those things because you don't know where they're coming from. And that was the entirety of her testimony, was based on the investigation done by somebody. And obviously, that is a Sixth Amendment violation, and it's way beyond anything of a summary witness testimony. And one other point I'd make about Kanetsky is that, as she admitted later on, what she did was she delineated and classified the payments. If we had known, if we had gotten proper notice, we would have had an accountant who would have said that Mr. Finner was paid for all of his mechanics liens and all those things. So there was no notice. It was objected to before trial. A proper record was made. The district court said when this was brought up at the beginning of the trial that, well, her name was on the witness list. The witness list was given to the defense about six days before trial. It had her name, but it just said Federal Bureau of Investigation. It didn't say anything that she was a forensic accountant or anything that would give us warning about anything. So all of a sudden, we got ambushed. And as I said in the transcript, I clearly said, I am surprised, I am ambushed. Is this a problem with discovery? Pardon me? Are you making a Rule 16 argument? That there was a violation, yes. And I raised it. And I raised it. And there was a motion in 2020, three years before the trial, about producing everything from Rule 16 and including 700 expert opinions, nothing from the government. Prior to trial, I had a checklist, of course, of the things that I could see that they had not done. I raised it in front of the district court saying there was no expert witness disclosures. I ask that because casting it as a discovery violation is a little surprising. I've just searched your brief for any references to Rule 16 and didn't find any. Perhaps that's what confused me. Oh, I'm sorry. I didn't say, well, Rule 16, but I pointed to the portions in the record. Obviously, I was limited by the word, so I didn't use that. But you see the sites to the record. It's where I made the Rule 16 request. And also, in the beginning of the transcript, at the beginning of the trial, I also made that request. I didn't say Rule 16. I said that there has been no produce. And I cited the expert witness provisions. Also, the court, in its initial scheduling order in the case in 2019, had ordered that there be expert witness disclosures. And that's docket number 19. The specific request for this information is docket number 92. Now, I only have a few minutes, and I'll just reserve my 30 seconds for rebuttal. But my contention is, my separate issue was that the defendants didn't defraud anyone. The government made this a crime after the fact of what they had done, because they changed the definitions of the mechanics lien statute, the Indiana mechanics lien statute, in order to make it a crime. So the defendants had no notice. And that's laid out in my brief. And that's the ex post facto argument that I have, that the defendants did not defraud anyone. They complied with the statute, gave notice, and the government made this a crime afterwards. I have to conclude, so I have a few seconds for rebuttal. Thank you. Thank you, counsel. Mr. Wrights. May it please the court, Brian Wrights for the United States. With the court's permission, I plan to address the issues in the order that the defendants did, starting with Graham's summary testimony. Summary witnesses may make inferences, but those inferences must be plainly evident from the records they review. Graham's inferences here were plainly evident from the records. But the defendants, by whiting out Mr. Berkley's business's name in BMV submissions, and by funneling his payments through Finner's accounts, plainly were concealing Mr. Berkley's involvement. In fact, the defendants implicitly admit this. Their defense below was that Finner had to pay because he had the relationship with the bankruptcy attorney. Here they say liability and professionalism means that the money had to come through Finner. That implicitly admits concealment. So here we are, I think a step back. We are four years from the start of this case. Significant pretrial litigation, a five-day jury trial, two sentencing hearings, four defense briefs, and we don't have a single other plausible, proper inference for what the defendants were doing. Now, I think that said, there could be some criticism with a couple of the phrasings of our questions. Lopez maybe points at that. This sort of gets to, Judge Jackson-Akumi, your harmless error analysis. I think on that it's important to note that Agent Graham testified for 200 transcript pages and said concealment six times. So this was not a pervasive aspect of her testimony. Of those six times, she was asked what effect the defendants' actions had, and the answer was concealment. I think that is a clear, factual inference. The other three times was more of a why the defendants asked the question. I think that is in line with the conclusion drawn in Lopez, although at the same point in time, it is broadly perhaps dangerous for us to ask those types of why questions. But the answer elicited was not problematic under this court's precedents that allow inferences to be drawn. And that's one reason it's harmless. I think the other reasons is that this evidence that Agent Graham summarized was already in evidence, so the jury could have looked at it. It was cumulative. Other testimony from Konecki that there was concealment. The former AMI employee, Joy Adams, testified that she assisted the payments that Berkley made through Fenner's accounts. So there was a lot of testimony that even if the word concealment wasn't used, that proved that concealment. And I don't mean to be too glib, but white out, the very reason it exists is to conceal. It doesn't take testimony for the jury to figure out if you white out something, you're concealing it. If there are no further questions on that, I'll move to Agent Konecki's testimony, which was lay testimony. This was not a forensic accounting of the documents. It was more akin to balancing a checkbook. I wish I would have given an example in my brief, so if I may do so here of what she did as a representative example. This is all on page 600 and 601 of the transcript. The defendants told the BMV that Mr. Berkley paid $4,750 for a freight liner truck. Konecki then looked at Mr. Berkley's business's expense sheets to see if that number was accounted for. He looked at a reconciliation statement that showed all the vehicles that Mr. Berkley had bought. It showed profits and losses on each. She looked to see if there was a $4,750 charge. There wasn't. In fact, the only expense was $3,000 something, which was comprised of the towing and storage cost fees. She then looked at a specific expense sheet of the vehicle because Mr. Berkley kept sheets, profit loss accounting sheets on each vehicle that ran through the scheme, and it has a list of the expenses related to that vehicle. The $4,750 is not shown, nor does the amount total, $4,750. So she was just matching one number to another number. Let's go with your characterization for a minute that these were uncomplicated financial records. So say in any given case you have a huge number of uncomplicated financial records, and it would take a layperson a year to go through them, but it would take somebody like Konecky or an expert only a week because they're familiar with these types of documents and the way numbers flow. Is it your position that that expert can testify as a lay witness even though, because they reviewed it and require their expertise, even though it utilized it? Essentially, yes. I think that's what the court has said in Christian and other cases, that witnesses that could be experts can still bring their particularized knowledge to bear on their testimony as long as the testimony itself doesn't require the specialized knowledge. We, of course, aren't disputing that Konecky may have been more proficient at doing this than another witness. The matching number to number does not take special expertise. I think there's a couple other things buried in there about the number of documents. So Davis says that doesn't matter, and I think it can't matter unless all summary witnesses are experts because to be a summary witness, the rules require voluminous records, and I don't see that the defendants are saying every summary witness must be an expert. There can be lay witnesses that are summary witnesses and experts. So the number of documents doesn't matter, nor does the fact that a witness that could be an expert bring some prior knowledge to bear on what she's doing. I think that is similar to how police officers can testify about what happened in a drug case, and they, of course, bring their prior knowledge. And I should say, too, that, of course, in drug cases, sometimes officers can be experts, but they can also be fact witnesses, even though they have the knowledge that could, depending on their testimony, allow them to be an expert. If the court has no further questions on that, I will move on to Bruton. I think the question here really is whether this error was plainly erroneous after Samia, and we submit it's not. Bruton and all the cases following have been careful to say that Bruton is about confessions, not admissions, and a confession is a confession to the crime, not facts supporting an element of the crime. So let's focus on that first step of plain error. Was it error for the government to introduce a co-defendant's statement that couldn't be cross-examined? No, Your Honor, we don't think so because it was not a confession. It was an admission of facts that went to an element or maybe went to a couple elements of the crime, though didn't establish either. We had to establish the scheme to defraud. The concealment and the fake auctions were part of that, but they weren't the entirety of the scheme. What more did Berkeley need to say for it to be a confession? Give me an example. I'll give you two. One may be obvious and one is more complicated and less obvious, but I'll start with the obvious one. So I think this is what Bruton says. If he was asked by an officer, did you and Mr. Finner scheme to commit fraud by doing this? And he said, yes, we did it. That, of course, is a confession, but we're not saying that is the standard. I think something that would go to all elements and more an admission to the crime, something like, yes, both of us did these things, meaning concealed the payments, had sham auctions, sent them to the BMV knowing that the BMV would not give us liens to the vehicles otherwise, and that allowed us to then obtain free and clear title to the vehicle and sell them. I know that is somewhat long-winded. I think that is necessarily so in a fraud case. It wouldn't have to be in other cases. If I may use murder as an example, a confession is me and the other guy did it, but a non-confession, although incriminating, would be something like me and the other guy were the only people there and now the victim is dead. That is not a confession to murder. So I think the confession here had to, if not prove every single element of the crime, encompass the key facts that go to all of the elements of the crime and perhaps prove some of the elements, so something akin to that. Like we did this scheme so the BMV would give us title to the vehicles and then we could then therefore sell them. That is closer to that. Me and another guy pulled the trigger. We're not admitting that the victim was killed. That's not a confession? No, that is a confession. So our point on this isn't that the confession has to necessarily establish every single element because that colloquially is not how people talk. So we killed the other guy. Maybe that doesn't go to intent, that type of thing, but it's an admission that you killed someone. That is a confession. It's just that if you don't have the operative facts in there of the killing, it's not a confession. That is our line. I think that squares both with what every court but the Tenth Circuit has said. It certainly is more faithful to Bruton and Sameah, which I think up the inferential incrimination standard, but faithful to Bruton at least that it requires a confession and admission. The Supreme Court at any point in time could have said admission, but they said confession, which has to mean me and the other guy did it. If there are no further questions on that, I do, even though the defense didn't talk about restitution, I want to make two quick points about restitution. So first of all, I think the standard review should be extremely important there. This court has said many times that sentencing is the main event, and the defendants are essentially trying to press this court into a fact-finding inquiry on appeal, and this court should not do so. Second, perhaps for the first time in my life, I did a little bankruptcy research, and I realized that, maybe not fun, but I realized that defendants' argument here is based on a misunderstanding of what occurs in these cases. Their argument is basically that every bankruptcy debtor's vehicle necessarily gets towed and repossessed to a third party, but that's not right. The Bankruptcy Code 1 has an automobile exemption, which allows debtors to keep their vehicles up to a certain amount of monetary value. That's 11 U.S.C. 52A2. So if the debtor keeps their vehicle, presumably they're going to continue paying their creditor, and the creditor would incur no cost. Second, the Bankruptcy Code also allows voluntary surrender, which that's 11 U.S.C. 1325A5C. It's also mentioned in the Sparrow, Indiana Court of Appeals decision, and by my basic research, the presumption, or what happens a lot of time, is that the debtor actually just physically returns the property or vehicle to the creditor, and in those situations, the creditor wouldn't incur any cost, too. So beyond the fact that the standard review should control the restitution, the defendant's arguments are based on a misunderstanding of bankruptcy. Since you have the time, tell us, say we find error on all three of the issues that the defendants are raising, what is left there to support the convictions? Just your skin, brief overview. So you have testimony from two former AMI employees that goes to a number of the facts about concealment, that Mr. Berkley was sending money or paying through a vendor's account. You have all the document record evidence. I mean, the e-mails are incriminating. In fact, I put them in my brief. There's significant documentary evidence. You have, I think, a lot of Graham's testimony left over. The defendants can correct me if I'm wrong. I don't view their objection as to everything Graham said, just particular opinions or inferences that she drew. So there's a lot of evidence still there. I think that is sufficient. On the three errors, I want to just propose a complicated issue on the Brewton error. Actually, before that, I want to say that for Berkley, we have Berkley's admission to the concealment. So that, for him, I don't see that a cumulative error works at all for him. Maybe it does for Fenner, but it does not for Berkley. That said, I want to go back to perhaps the academic exercise on the three errors. The court has said that for cumulative error, you can combine errors and plain errors. I have not found anything that says the courts have combined, this is going to be difficult, errors, and then unobjected to errors that were not plain can go to cumulative error. In other words, I know. I think doing so with the Brewton would sort of give the defendants a benefit of not objecting if the error, because it would allow them to find an error on plain error that's not plain. Now, of course, if the court finds that error as plain, i.e. meets the second prong, then it could be factored in that analysis. I'm not sure it should be factored in if it only meets the first prong of plain error, and I get that as sort of rounding the circle, but we've not found anything, and I think that is faithful and adheres to the plain error rule and what the Supreme Court said about the importance of objecting contemporaneously. But we think there would be sufficient evidence anyway. Of course, the more errors the court finds, the more difficult it would be, at least to Fenner, but we think there's still sufficient evidence, founded especially on the records, which are quite incriminating. Because I should say one other thing, too. That type of evidence was not inadmissible, so this isn't a case where actual inadmissible evidence came in. Perhaps an inadmissible inference came in, an opinion, but the evidence itself was not improper. If the court has no further questions, we ask to affirm. Thank you. Thank you, counsel. Mr. Hall, is there anything further? Thank you, Your Honors. To the extent the government offers a meaningful rule about when Bruton will apply, the exception under their proposal would swallow the protections that Bruton provided. Nothing in the Supreme Court precedent speaks to an all-elements rule or about a full confession. Those cases and this court's precedent speak to whether the statements were powerfully incriminating. And here they were. The defendants were charged with, among other things, concealment money laundering, and the statements that came in said there was really no purchase, there was no money exchange. Berkeley paid the attorney's fees out of one of Fenner's accounts, and it was done to conceal that he paid them. It was really a prearranged deal that they already had. Those are powerfully incriminating statements. Bruton applies, and it constitutes plain error because it was intentionally elicited by the government as the capstone to its case below. The government does not cite the plain error cases that we cite in our brief. Morales and Lange from the Fifth and Ninth Circuits much less respond to them. And this court's decision in Jones and the Eleventh Circuit decision in Schwartz show how even if there is other potentially incriminating evidence, a powerfully incriminating Bruton violation can still constitute non-harmless error requiring a new trial. The government also pointed to Graham's speculative conclusions. It agrees that the test is that they must be plainly evident from the documents, but it argues that her testimony regarding concealment was. That is not the case. Graham herself conceded that testimony regarding concealment was an inference she drew and that there were other potential inferences from the documents. That's at transcript page 536. And the government admitted at closing that they were Graham's inferences regarding concealment. That shows that they were not plainly evident from the documents. Can you skip to Kanetsky? Because, you know, she probably could have been qualified and presented as an expert. But as you know, the test is whether the testimony required the expert knowledge. And so I hear you on her description of her own job and herself and her specialized knowledge, but what complex thing did she do from your perspective? Where do you see her utilizing her specialized knowledge? Because you heard Mr. Wrights say this was a matching game. Your Honor, her conclusions, the character of them, show that her testimony was expert. She looked at the financial documents, which were voluminous, complex, and interrelated, and she drew the conclusion that the accounting showed that no genuine sales occurred. That is expert because it requires her to consider all of the different ways in which the accounting might demonstrate those sales and confirm that they don't exist within these records. You know, a counterfactual I think helps prove the point, which is that an untrained layman, as this court described it in Kahn, would be at sea looking at these 10,000 pages of financial records interrelated across businesses and individuals across a number of years. And the fact that an untrained layman could not do the same analysis that Konetsky did demonstrates that her testimony was expert. The government also claimed that Fenner admitted concealment, and that is not true. Mr. Fenner provided a non-concealment-based explanation, which if the jury believed, they would have acquitted. The difference between that is meaningful, and it's particularly meaningful in this case where defendants were again charged with concealment money laundering, where the statutory language requires that the jury find that they engage in these transactions knowingly, knowing that they were designed to conceal the source of the funds. The fact that Graham, and I say that I'm out of time, Your Honor, may I finish my point? Finish your sentence. Thank you, Your Honor. The fact that Graham testified using the statutory language demonstrates the inadmissibility of the testimony and the prejudice. Thank you, Your Honor. Thank you, counsel. Mr. Turner, you have 17 seconds. I'll round it up to 20. If there's error on Graham and Konetsky, there's nothing. All of her testimony, Ms. Graham, was based on the investigation. Bessinger says you can't do that. The government hasn't addressed that the defendants didn't defraud anyone. They didn't. Konetsky delineated, analyzed, and classified payments. There were lots of payments between Mr. Fenner and Mr. Berkley, and those payments constituted payments for the mechanics. Thank you very much. Thank you, Mr. Turner. And, Mr. Hawes, we appreciate your willingness and that of your law firm to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement.